𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉。

DIRECTOR GENERAL OF RAILROADS, ETC., V. HUBBARD'S ADM'R.

March 16, 1922.

Absent, West, J.

1.  RAILROADS — *Director General of Railroads — Parties — Action Against the Director General and a Railroad.*—In the instant case, an action against the Director General of Railroads and a railroad for the death of plaintiff's intestate, who was killed by a train of the railroad while the railroad was under the·control of the federal government and operated by the Director General of Railroads, the refusal of the trial court to dismiss the action against the railroad on the ground that, if there was any liability, the Director General was solely liable, was error.

2.  RAILROADS—*Injuries on or Near Track—West-Bound Train Running on East-Bound Track.*—In an action for the death of a signal maintainer killed by a train, one of the grounds of negligence alleged was the failure to notify deceased of the transfer of the west-bound train, which killed him, to the east-bound track.  The transfer was made while decedent was between telegraph stations and could not be notified.  Decedent was going west on a motor car on the west-bound track and transferred his car to the east-bound track shortly before he was killed.

    *Held:*  That it was not necessary to notify the train crew that decedent had gone ahead on the west-bound track, and the signalman could not be notified between stations.

3.  RAILROADS—*Injuries on or Near Track—Transfer of Trains From One Track to the Other—Case at Bar.*—In the instant case, an action for the death of a signal maintainer by a west-bound train running on the east-bound track while it was the custom to run trains going west over the west-bound track, and trains going east over the east-bound track, the railroad company had the right to use its tracks interchangeably for trains going in either direction, and it was its constant habit to so use them whenever circumstances made it desirable to do so, and the rules of the company gave full warning of this fact, and the decedent had full knowledge thereof.

13

4. RAILROADS—*Injuries to Persons on or Near Track—Lookout by Engineer and Fireman—Burden of Proof to Show Negligence —Case at Bar.*—In the instant case, an action for the death of a signal maintainer by a west-bound train running on the east-bound track, the burden of proof was on the plaintiff to establish the negligence of the engineer and fireman of the train which killed decedent, in failing to discover the presence of plaintiff's decedent on the track and warn him of the approach of the train, and the evidence in the instant case was insufficient to establish the fact that there was negligence in the failure of the engineer and fireman to see the deceased.

5. RAILROADS—*Injuries on or Near Track—Outlook by Fireman.*— It is the duty of a fireman, primarily, to fire his engine, and his employer cannot be charged with negligence for his failure to keep an outlook at a time when his duties require him to be firing.

6. DOCUMENTARY EVIDENCE—*Photographs and Drawings—Weight Attached To.*—Photographs and drawings do not always give us as accurate ideas of what may be seen from the *locus in quo* as the testimony of unimpeached witnesses who have been on the ground and have observed the situation, and testify as to what can and what cannot be seen from a given point. Such photographs and drawings, however, when consistent with the testimony of witnesses, are strongly corroborative of their testimony.

Error to a judgment of the Circuit Court of Alleghany county in an action of trespass on the case. Judgment for plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*J. M. Perry,* for the plaintiffs in error.

*Geo. A. Revercomb, R. C. Stokes* and *Chapman Revercomb,* for the defendant in error.

BURKS, J., delivered the opinion of the court.

This is an action against the Chesapeake and Ohio Railway Company and the Director General of Railroads to re-

cover damages for the death of the plaintiff's intestate, who was killed by a passenger train on the Chesapeake and Ohio Railway on March 31, 1919, while that company was under the control of the federal government and operated by the Director General of Railroads. After the evidence was all in, the defendants demurred thereto and the trial court overruled the demurrer and entered judgment against both defendants for the sum of $8,000, the amount of the damages assessed by the jury in their verdict. To that judgment, a writ of error was awarded by one of the judges of this court.

The defendant was operating a double-track railroad from Covington to Jerry's Run, a distance of about sixteen miles. Between these two points there are two other block signals, one at B. S. cabin and another at Moss Run. Between Moss Run and Jerry's Run there is no telegraph station and no means of communicating with trains. Trains may be diverted from one track to the other at B. S. cabin and Moss Run by "crossovers" and by switches at Jerry's Run. Just west of Jerry's Run is Lewis tunnel, about seven-eighths of a mile long, and through which the track is single. About half a mile east of Jerry's Run there is a disused signal station, known as "Old Jerry's Run," on the north side of the railroad, which is occupied by a Mrs. Fridley as a dwelling. From Moss Run to Jerry's Run is up-grade. Just east of Mrs. Fridley's house and Old Jerry's Run tower, the railroad passes through a cut, the bank of which is eighteen feet high on the south side—the fireman's side going west. The western portal of this cut is thirty feet east of Old Jerry's Run tower. Trains going west come around a right-hand curve along the base of the mountain until it reaches the western portal of a cut nearly a quarter of a mile east of Mrs. Fridley's house, from thence the track is straight for 830 feet to a point in the cut just east of Mrs. Fridley's house. It then turns to the

left and continues to the left on a three-degree curve to and beyond the point of the accident. Mrs. Fridley's house is thirty-five feet from the east-bound track, and has one window fronting the railroad and another looking west along the railroad track. There is a high bluff on the right or north side of the railroad just west of Mrs. Fridley's house. From a point on the railroad just opposite Mrs. Fridley's front window to the point of set over, hereinafter mentioned, is 228 feet five inches, and from the latter point to the point of accident is 311 feet, thus making 539 feet five inches from Mrs. Fridley's window to the point of the accident. From the point of the accident, looking east, to the curve in the cut just east of Mrs. Fridley's is 754 feet six inches.

Lewis Hubbard, the plaintiff's intestate, was a signal maintainer of the Chesapeake and Ohio Railway Company, and at the time of his death had eighteen months' experience as such. For the purpose of discharging his duties, he was provided with a gasoline motor car. On March 31, 1919, in discharge of his duties, he set out with a companion, Saville, on the motor car, to make the trip from Covington to Jerry's Run. He arrived at Moss Run cabin at 7:50 A. M., and went into the telegraph office and inquired about the running of trains. He was told that a west-bound freight was approaching and where it was, and that the west-bound express train No. 1 was following the freight. He inquired "if there was any show of west-bound No. 1 going by the east-bound track," and the operator told him that he did not know; that he had had no orders to that effect. It was seven miles from there to Jerry's Run. With this information, Hubbard left Moss Run at 8:12 A. M. and put his motor car on the west-bound track, and when last seen he and his companion were making good time going west. The freight train (No. 742) passed Moss Run at 8:22 A. M., and proceeded west on the west-bound track

without stopping. At that time no orders had come to the operator with reference to diverting the express train No. 1 to the east-bound track, but, as the freight train passed, the operator at Moss Run was instructed to "watch No. 1," which he explained was for the purpose of putting the operator on guard for orders for No. 1. At 8:30 A. M., twenty minutes after Hubbard had left on the west-bound track, the operator at Moss Run received orders to divert No. 1 to the east-bound track, and at 8:43, thirty minutes after Hubbard had left, No. 1 arrived at Moss Run and was diverted from the west-bound to the east-bound track in accordance with these orders. After leaving Moss Run, Hubbard and his companion had trouble with the motor on their car, and were pushing it along the west-bound track when they passed Mrs. Fridley's house at Old Jerry's Run cabin. After they had passed her house about 200 feet, Mrs. Fridley heard the whistle of No. 1 some distance east of her house, but the windows and doors were shut and it was a quite blustery morning, and she could give no idea as to how far the engine was at that time east of her house. However that may be, looking through the side window of her house, which was closed, to the west-bound track, when she heard the whistle blow, she saw Hubbard and his companion set the motor car over from the west-bound track to the east-bound track and proceed to push it along the up grade on the east-bound track without ever at any time turning their heads to look back. While they were thus pushing their car along the east-bound track, Mrs. Fridley was still standing at her window and saw No. 1 when it passed on the eastbound track, and she continued to watch the train and Hubbard and his companion until the engine struck them, killing Hubbard and severely injuring his companion. The point at which Hubbard was struck was 311 feet west of the point of set over. Mrs. Fridley was examined as a witness for the plaintiff, and testified that she

was looking out of the window facing the track when No. 1 passed, and she could see through the windows of the engine, and that there was no one on the engineer's seat or on the fireman's seat when the train passed her house, and that there was a curtain hanging down at the back of the cab between the engine and tender, and that she could see through the gangway, but saw no one there. She also testified that she could see no glow from the fire in the engine when it passed her house, and that if the fire box had been opened there would have been such glow and she would have seen it. Leffel, a witness examined for the plaintiff, testified that from the point of set over down to what he calls the whistle post looking east is a distance of at least a quarter of a mile, although he did not measure it, and that the track is nearly straight for that distance. He also testified, however, that there is a curve in the cut just east of Mrs. Fridley's house, and from there to the point of the accident, a distance of 754 feet six inches, the view of the engineer would be cut off. There was offered in evidence two photographs, one marked Exhibit A, and taken from the point of the accident looking east, and showing the track and the Fridley house. The other marked Exhibit B, taken from a point in front of Mrs. Fridley's house (Old Jerry's Run cabin), looking west, to the point of the accident, and a diagram showing the cut and bluff east of Mrs. Fridley's house, and the bluff west of her house and the immediate surroundings.

The location of what is spoken of by Leffel in his testimony as the whistle post is not definitely fixed by the testimony, nor can it be told from the testimony where the engine was at the time of the whistle spoken of by Mrs. Fridley. The engineer testified that it was customary to blow for Old Jerry's Run cabin, and at some times it was done and at others not, after the removal of that station, and that he had no recollection as to whether the whistle

was blown for Old Jerry's Run on the morning of the accident or not. Unless the engineer ör fireman could have seen the point of set over, or the deceased after the set over, it is unimportant as to the point at which the whistle was blown except to show the time and place of the set over and the distance traveled after the set over and before the accident. The engineer estimated that he was traveling at the rate of from fifteen to seventeen miles an hour, and as Hubbard and his companion traveled 311 feet after the set over before the accident, it would seem that they were walking at the rate of about three miles an hour. If the engine was traveling at the rate of fifteen miles an hour and Hubbard was walking at the rate of three miles an hour after the set over, it would place the engine about a quarter of a mile off when the whistle was blown.

[1] A motion was made in the trial court to dismiss the action against the Chesapeake and Ohio Railway Company on the ground that, if there was any liability, the Director General was solely liable, but the motion was overruled and exception taken. This is assigned as error. This ruling of the trial court was erroneous, and its action in this respect will be reversed, and judgment will be entered in this court dismissing the action as to the Chesapeake and Ohio Railway Company with costs. *Missouri Pac. R. Co.* v. *Ault*, 256 U. S. 554, 41 Sup. Ct. 593, 65 L. Ed.; *N. & W. Ry. Co.* v. *Arrington*, 131 Va. 564, 109 S. E. 303.

[2, 3] One of the grounds of negligence alleged in the declaration was the failure of the defendants to notify the plaintiff's intestate of the transfer of the train which killed him from the west-bound track, where such train would usually go in the ordinary course of traffic, to the east-bound track. The transfer was made while the decedent was between telegraph stations and could not be notified, but there was no necessity to notify him, as he was in a place of safety and had only to remain there to avoid danger from the

train which was transferred. He was going west on the west-bound track and the train was transferred to the east-bound track, and the transfer was really in his interest. So also, there was no necessity to notify the crew of the train that the decedent had gone ahead on the west-bound track. They were on different tracks and could not collide as long as they remained there. Moreover, while it was the custom to run trains going west over the west-bound track, and trains going east over the east-bound track, the railroad company had the right to use its tracks interchangeably for trains going in either direction (*Imler* v. *Northern P. R. Co.*, 89 Wash. 527, 154 Pac. 1086, L. R. A. 1916, 702, Ann. Cas. 1917A 933), and it was its constant habit to so use them whenever circumstances made it desirable to do so. The engineer who ran the train in the instant case testified that such changes were made over the identical piece of track as often as three days out of seven in the week. The rules of the company gave full warning of this fact, and the evidence is abundant to show that the decedent had full and ample notice and actual knowledge of these facts. No negligence on the part of the company was shown in this respect.

Another ground of negligence charged in the declaration was that the servants of the defendant operating the train which killed the plaintiff's intestate "did see and discover the plaintiff's decedent upon the track ahead of said train a sufficient distance to have stopped said train before it struck him," and a sufficient distance to have warned him of its approach, but failed and neglected to do so. There was no evidence to support this allegation, and it need not be further noticed.

[4] The only remaining ground of negligence alleged was the failure of the servants operating the train to discover the plaintiff's decedent on the track and warn him of the approach of the train. These servants were the engineer and

fireman of the train which struck Hubbard. We will in-
quire, therefore, could the engineer have seen the place of
set over, or beyond that point? The track makes a curve in
the Old Jerry's Run cut, and after reaching this, the curve
is against the engineer and he could not see the track six
feet beyond his engine. This is fully and clearly established
by the testimony of several witnesses. Before reaching this
curve there is a piece of straight track 830 feet long. From
the engineer's seat on the seat box to the front end of the
engine is forty-five feet. This seat is on the right of the
engine and there rises above him on the left the boiler and
smoke box, thus obstructing his view to the left so that his
lookout is practically straight in front of him. The point of
set over is 443 or 460 feet (measurements differ) from the
west end of the straight track and this curve is to the left
and against the engineer and continues against him to the
point of the accident. • In addition to this, even if the en-
gineer while traversing the straight track, could have seen
to the left, his view was obstructed by the bluff eighteen
feet high in the cut just east of Mrs. Fridley's house. But
he does not claim that his view was obstructed because he
couldn't see it from his side of the engine. He says: "I
don't say it obstructed my view, because I could not see that
bluff from my side of the engine, but what I meant to say,
if a man had been looking out of the left side, he would not
see anything on that track *until he got by the bluff*." (Ital-
ics supplied.) And the division engineer of the company
testified that the straight track "is blocked off from the
scene of the accident by a big bluff eighteen feet high." The
same bluff blocked off the view of the point of set over.
The engineer further testified as to the extent of his view
while along the little piece of straight track before you get
to the end of the cut, that looking ahead from his position
"you could see the Old Jerry's Run and then you see into
another bluff which is 100 feet high, I reckon." If we look

to the blue print used on the reargument, not for the purpose of adding to the evidence, but to visualize the testimony of the witnesses, we find that a straightedge placed along the piece of straight track and extended beyond the curve in the cut strikes the bluff west of Mrs. Fridley's house on the north side of the west-bound track, and leaves the place of set over and the track up to the place of the accident out of the line of vision of the engineer, thus by the physical facts confirming the testimony of the engineer. The photograph (Exhibit A) and drawing (Exhibit 2) seem also to demonstrate the fact that the point of set over was not in the line of vision of the engineer. The engineer testified also that he was on his seat and constantly on the lookout from the time he came in sight of Old Jerry's Run until the deceased was struck, and did not see him. The testimony of Mrs. Fridley to the contrary, if credible, can make no difference, for the curve was against the engineer when the engine passed her house and continued so until the deceased was killed, and no amount of diligence or outlook on the part of the engineer could have discovered his presence on the track.

We conclude, therefore, that there was no negligence on the part of the engineer in failing to discover the deceased at the point of set over or thereafter.

Could the fireman have seen the point of set over or beyond that point?

[5, 6] It is the duty of a fireman, primarily, to fire his engine, and his employer cannot be charged with negligence for his failure to keep an outlook at a time when his duties require him to be firing. *Brammer* v. *Norfolk & W. R. Co.*, 104 Va. 50, 51 S. E. 211; *O'Brien* v. *Wis. C. R. Co.*, 119 Wis. 7, 96 N. W. 424. His train was running up grade and he was approaching a long tunnel in which it was desirable to minimize the smoke and gas from the coal, and at the time of the accident he had his engine "just as hot as I could get it." It

is important, however, to ascertain when or where he began firing. From the west portal of the cut just east of Mrs. Fridley's to the point of the accident the curve was in his favor, and if he had been on his seat box the deceased would have been in plain view and he could have warned him of his danger. His testimony as to the places and distances is not very accurate, and must be read as a whole and taken in connection with the testimony of other witnesses to ascertain the facts. It is true that, in answer to the question where he began firing, the witness stated that it "must have been just west of the tower, not very far west of the tower—that is, Old Jerry's Run tower," but in answer to the question immediately preceding the present answer he had confused the points of the compass and said west when he meant east, and it seems manifest from other answers given by him, as well as the testimony of other witnesses, that he began the firing east of the tower and not west, as he stated. In answer to other 'questions he stated that as he went into Old Jerry's Run he "was putting in fire"; that before he got to Jerry's Run he had "dropped off his seat" and was "down at the time"; that he had not come in sight of the deceased when he dropped off his seat box to put in the fire; that he was looking out that day before he got down to put in coal, but was not looking out when he came into Old Jerry's Run. In addition to this, Mrs. Fridley, the plaintiff's own witness, testified that he was not on his seat in the engine when the train passed her house, which was very close to the west portal of the cut, and the engineer that at the time of leaving the straight track and taking the curve in the cut, he was putting coal in the engine. We are satisfied that when the engine emerged from the west portal of the cut and passed Mrs. Fridley's house, the fireman was engaged, and properly, in firing his engine. We do not attach great importance to the fact that Mrs. Fridley did not see any glow from the

fire box at that time of the day, and under the exciting circumstances detailed by her; for it may be, as suggested by counsel for the defendant in error, that he had not yet opened the door of the engine and was simply preparing to fire his engine. If he was down in the gangway between the engine and tender making the necessary preparations to fire, he was as much engaged about his business and as free from negligence as if he had the door open and was actually shoveling coal into the engine. We do not think that the evidence sustains the suggestion that the fireman could have seen the place of set over or beyond that point while traversing the straight track before entering the cut just east of Mrs. Fridley's house. Exhibit A and Exhibit No. 2, hereinbefore referred to, seem to negative the possibility of his seeing it. But photographs and drawings do not always give us as accurate ideas of what may be seen from the *locus in quo* as the testimony of unimpeached witnesses who have been on the ground and have observed the situation, and testify as to what can and what cannot be seen from a given point. Such photographs and drawings, however, when consistent with the testimony of witnesses, are strongly corroborative of their testimony. In this case, it appears that on the south side of the railroad in the cut just east of Mrs. Fridley's house there is a bluff eighteen feet high, and that it blocks off the view from the straight track. This bluff is on the fireman's side of the engine going west. Division Engineer Beall was examined as to the siraight track, and testified, amongst other things, as follows:

"Q. And that straight track you just spoke of is blocked off from the scene of the accident by a big bluff eighteen feet high, isn't it?

"A. Yes, sir." And the engineer testified that while on the straight piece of track in the cut, "if a man had been looking out of the left side he would not see anything on the track until he got by the bluff." This is all the testimony there is on the subject, and it is sup-

ported by the exhibits referred to. It is admitted that this bluff falls away rapidly to the south, but it does not appear that it ceases to obstruct the view from the straight track. It is also claimed by the defendant in error that the testimony of his witness, Leffel, is to the contrary, because he states that a person standing on the west-bound track at the point of set over could see an engine come into view for a distance of about a quarter of a mile, and from that counsel argue: "And, *vice versa,* a person on an engine going west on the east-bound track could see the point on the rails of the west-bound track where decedent was, and at which he set over his motor car, for a distance of about a quarter of a mile." This is plainly a *non sequitur.* If he had said he could see the engineer or the fireman, his conclusion might have followed, but not "an engine come into view." The evidence of what could have been seen from the engine by the fireman is not sufficient to establish negligence on the part of the fireman in failing to see the set over and the deceased thereafter. On the contrary, it negatives the idea. The burden was on the plaintiff to establish that fact.

Upon the whole case, we are of opinion that the trial court erred in overruling the defendant's demurrer to the evidence, and hence its judgment must be set aside, and this court will enter judgment sustaining said demurrer to the evidence and dismissing the case at the plaintiff's costs.

*Reversed.*

SIMS, J., dissenting:

1 find myself unable to concur in that portion of the majority opinion which holds that the evidence of what could have been seen by the fireman is not sufficient to establish negligence on part of the fireman in failing to see the set

over and the deceased thereafter as he was pushing the motor car and moving along the east-bound track in front of the approaching train in obvious unconsciousness of his peril.

The evidence on this subject is conflicting, but the defendant demurred thereto, and, as I view the case, there was evidence for the plaintiff in direct conflict with the testimony for the defendant, which is referred to in the majority opinion, on the subject of what the fireman could or could not have seen of the set over and the subsequent perilous position of the deceased when and after the whistle was blown, and before the fireman got down off his seat to fire his engine; so that under the well-settled rule pertaining thereto, such evidence for the defendant should be disregarded by us.

This is true of the testimony of the fireman which is in conflict with the testimony of Mrs. Fridley on the subject of when the fireman got down from his seat. But, aside from that, the following conclusions, it seems to me, should be reached, on considering the evidence upon the demurrer thereto.

In the first place, it should be noted that, if the engine which killed the deceased was traveling at the rate of fifteen miles an hour and the deceased at the rate of three miles an hour after the set over, as stated in the majority opinion, the engine was traveling just five times as fast as was the deceased. So that while the deceased was traveling the 311 feet from the place of set over to the place at which he was killed, the engine traveled only 1,555 feet—a little over a quarter of a mile. This would place the engine a little less than a quarter of a mile off from the deceased when the whistle was blown.

It would follow from this that the whistle was blown just about the time the engine came upon the east end of the piece of straight track referred to in the majority opinion,

which was a point 830 feet plus 754 feet six inches (equal to 1,584 feet six inches) from the place where the deceased was killed. Now, bearing in mind that, according to the direct testimony for the plaintiff the set over occurred immediately following the blast of the whistle, it is plain that the crucial question, as affecting the inquiry concerning the negligence of the fireman in the matter of the lookout kept by him, is what could he have seen of the scene of the set over and subsequent perilous position of the deceased, which was present in front of the onrushing engine as it passed from about the east end of the straight piece of track, for a distance of about 830 feet plus 100 feet about, making about 930 feet, to a point somewhat east, but near, the western portal of the cut, where the fireman got down from his seat to fire his engine, according to his own testimony? (Just here it should be noted that the west end of the 830 feet of straight track is at a point in the cut 100 feet east of the west portal of the cut, and, according to the fireman's own testimony, after correcting his first error in confusing "west" with "east," referred to in the majority opinion, he did not get down from his seat to fire his engine until the engine had about reached the west portal of the cut.) The evidence makes it clear that it was during this time that the set over occurred and the deceased traveled somewhat over half the distance of 311 feet from the place of set over to the place where he was overtaken and killed; and that, if the piece of straight track aforesaid was not so much out of line with the place of set over on the section of railroad track immediately west of that point as to cause the front of the engine to obstruct his view of the scene at the set over and the conduct of the deceased immediately following, the engineer could and should have seen this scene; and, further, that if, because of the reason mentioned, the front of the engine did cut off the view of the engineer of such scene, the drama was in plain view

of the fireman from his seat, unless the bluff which formed the wall of the south side of the cut obstructed the fireman's view.

Now, as the evidence which was introduced before the jury appears in the record, without the aid in its interpretation which is supplied by the blue print used in the reargument, it seems plain that, on demurrer to the evidence, the inference which must be drawn from Leffel's testimony is that either the engineer or the fireman, more probably the engineer, had an unobstructed view of and would have seen the scene aforesaid and the consequent perilous position of the deceased before the engine reached the west end of the piece of straight track had they discharged the duty of lookout resting upon them. That if this was true of the engineman, the front of the engine did not at any time obstruct that view of the engineman while the engine was on the straight track. That if this was true of the fireman, the bluff which formed the wall on the south side of the cut did not obstruct the view of the fireman at any time while the engine was on the straight track, or while it was passing over most of the farther distance of 100 feet from the west end of the straight track to the west portal of the cut.

As bearing upon the conclusion just mentioned, the following should be borne in mind: The testimony of the division engineer referred to in the majority opinion, in regard to "the scene" being "blocked off" by the "big bluff eighteen feet high"—which is the bluff aforesaid which forms the south wall of the cut above mentioned—this testimony has reference to "the scene of the accident," the view from the engine of the place where the deceased was struck and killed, which was 311 feet west of the scene of the set over. This testimony did not even contradict the testimony for the plaintiff tending to show that from the point where the engine was immediately following the blast

of the whistle, namely, about the east end of the straight track, until the engine had reached the west end of the straight track, which was before the fireman got down from his seat to fire the engine, either the engineer or the fireman, if they were in their then place of duty and on the lookout ahead, had the scene aforesaid of the set over and the moving of the deceased along the east-bound track for a distance therefrom of some 150 feet or more, in obvious unconsciousness of his peril, in plain and unobstructed view. It is immaterial if the engineer or fireman did not, in addition to the set over, see the deceased traverse the whole 311 feet until he was struck. It is enough to impose the liability in question on the defendant, if the engineer or fireman saw the set over and the deceased going on in the attitude he presented for 150 feet and more from the place of set over, until he passed out of sight of the engineer or fireman.

Further: According to the engineer's testimony, when the engine was on the east-bound track at the west end of the straight track, he could see the west-bound track six feet west of Mrs. Fridley's house. Another engineer, a witness also for the defendant, testified that going west on the east-bound track, on the straight stretch of track, he could see along the railroad west of Mrs. Fridley's house "about half way between the house and the point of the canon," the point of the canon being the place of set over, which is about 108 feet west of the west end of Mrs. Fridley's house, instead of six feet, as testified to by the first-named engineer, and about 108 feet from the place of set over. The defendant's own testimony, therefore, showed to the jury that the testimony of the engineer in charge of the engine in question at the time the deceased was killed, with respect to how far along the tracks he could have seen while the engine was on the straight track, was unreliable.

Further: The line of vision of the engineer from his seat in the engine in question was not absolutely straight ahead. The front of the engine, extending only forty-five feet ahead

14

of the engineer's cab, was not an obstruction which presented a perpendicular side along which the engineer had to look, but a side cylindrical in form, and several feet below the eyes of the engineer, curving to the south up to the smokestack, so that the line of vision of the engineer was from his cab window obliquely to his left, along by the north side of the smokestack, at a considerable angle to the southwest of the direct line in which the engine was pointed as it traversed the straight track. Indeed, it is a matter of common knowledge that an engineer can see the whole track directly in front of his engine at no great distance ahead when traversing a straight track. And it is also a matter of common knowledge that the farther and farther ahead, when moving along a straight track, the engineer projects his line of vision, the wider is the radius of that line of vision; such radius gradually crossing the track, then passing to the side of it on the left of the engineer, so that when he looks—say, a quarter of a mile ahead—his line of vision to his left side will extend a great many feet to the left of the line toward which the engine is directly pointed.

The testimony for the defendant with respect to how far the engineer could see ahead ignores the physical facts just referred to—it does not distinguish between how far ahead the engineer on the engine which struck the deceased could have seen along the tracks from his seat on the engine when it was near the east end of the straight track, as compared with when it was at the west end of the straight track. And the engineer whose testimony as to how far he could see ahead is referred to in the majority opinion, expressly testifies only to how far he could see ahead along the tracks from the engine as it started "to leave the straight track," or "as it leaves the straight track," *i. e.,* from a point which is at the west end of the straight track. The locality from which the drama aforesaid was to have been seen by the

engineer, if seen at all by him, was east of such place, namely, before the engine reached that place, and while it was passing from the east end of the straight track to the west end of it, the distance of about 830 feet, immediately after the whistle was blown.  The jury had the right to bear this fact in mind and to conclude that the testimony of the engineer last mentioned was in truth not in conflict with the testimony of Leffel, which tended to show that, from the place where the engine was when the drama aforesaid was acted, the engineer would have seen it if he had looked ahead.

Or, to say the least of the evidence in favor of the plaintiff, on demurrer, it appears, when the position of the engine at the crucial point of time and place aforesaid is visualized in the mind, that the position of the engine was such that if the line of vision of the engineer was too far to his right for him to have seen the drama aforesaid acted before him, that line of vision came so near to the scene of action of the deceased that it is manifest that the fireman at that same time, sitting in the engine cab on the other side of the engine, had a line of vision, which would have passed through the cut above the right of way of the railroad and embraced so much of the scene as is material, unobstructed by the bluff which formed the south wall of the cut.  And this was the situation when the engine was ample distance away from the deceased for it to have been stopped by the exercise of reasonable diligence on the part of the defendant, before it ran around the curve upon the deceased, and when the fireman, according to his own testimony, was not occupied by his duty of firing the engine and had not yet gotten down from his place.

When we come to consider the blue print used on the reargument, that does show that while the line of vision of the engineer, when the engine was at the crucial point of time and place aforesaid, put the initial movement of the

set over in plain view of the engineer. However, as the engine moved westward, the engine front probably cut off the view of the engineer of the set over on the east-bound track and the movement thence of the deceased from that point onward. But a straightedge, placed from such crucial point on the straight track to the point of set over, and having its westward end moved to a point, say of about halfway from the point of set over to the place where the deceased was struck and killed (covering a space along the track of, say 150 feet, including and beyond the place of set over), demonstrates that the fireman, from the time the whistle was blown until he got down from his seat as the engine was near the western portal of the cut, had the scene aforesaid, or so much thereof as is material, in his plain view, unobstructed by the bluff aforesaid which formed the south wall of the cut.

The material part of the blue print aforesaid, on a reduced scale, and with some additional lines and notations thereon, is here copied:

As appears from the blue print, following the blast of the whistle, the line of vision of the fireman, where it was nearest to the tangent to the curve of the railroad, would have passed over the ditch on the south side of the railroad, in covering the scene of the set over. And, as that action of the deceased must have occupied an appreciable length of time, the engine, during that occurrence, moving westward at the rate of approximately fifteen miles an hour, must have been moving so far along the straight track, when the deceased moved off after the set over, that that movement, for a distance of certainly 150 feet, more probably for over 200 feet, must have been within the line of vision of the fireman before he got down from his seat, according to his own testimony, which line of vision would have passed, where it was nearest to the tangent of the curve of the railroad, along the inclined side of the bluff which formed the south wall of the cut, not higher up than half way of its eighteen feet of height, and hence would have been unobstructed by such bluff. This clearly appears from the dotted lines I have drawn and the notations I have made on the said blue print.