# Richmond.

## DAVIS, DIRECTOR GENERAL, v. SAVILLE.

### November 15, 1923.

1. RAILROADS—*Injuries on or near Track—Negligence of Fireman and Engineer—Case at Bar.*—The instant case, an action for the death of an assistant signal maintainer killed by a train while pushing a gasoline motor car on the track, was a companion case of *Davis, Director General,* v. *Hubbard's Adm'r,* 132 Va. 193, 111 S. E. 446, and as in that case the burden of proof was on the plaintiff to establish the negligence of the engineer and fireman of the train which killed decedent in failing to discover the presence of plaintiff's decedent on the track and warn him of the approach of the train, and the evidence in the instant case was insufficient to establish the fact that there was negligence in the failure of the engineer and fireman to see the deceased.

2. DOCUMENTARY EVIDENCE—*Photographs—Drawings—Weight Attached to.*—Photographs and drawings do not always give us as accurate ideas of what may be seen from the *locus in quo* as the testimony of unimpeached witnesses who have been on the ground and have observed the situation and testified as to what can or what cannot be seen from a given point.

Error to a judgment of the Circuit Court of Alleghany county. Judgment for plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*J. M. Perry,* for the plaintiff in error.

*Revercomb & Revercomb* and *R. C. Stokes,* for the defendant in error.

BURKS, J., delivered the opinion of the court.

[1, 2] This is the companion case of *Davis, Director General,* v. *Hubbard's Adm'r*, 132 Va. 193, 111 S. E. 446. Hubbard was killed and Saville injured in the same accident. They were assistant signal maintainers of eight months experience on the Chesapeake and Ohio Railway, and traveled from place to place on the railroad, in the discharge of their duties, in a gasoline motor car. The scene of the accident was on a piece of double track, and while trains going west usually traveled on the westbound track and those going east on the eastbound track, it was a very common practice, with which Hubbard and Saville were familiar, to reverse the traffic at different points. The accident occurred at a point a short distance west of old Jerry's Run tower, and the injury was inflicted by an express train carrying eight coaches and running up-grade at from fifteen to eighteen miles an hour. The railroad is here climbing the Alleghany mountains. It runs well up on the side of the mountain, frequently cutting through rocky bluffs and constantly curving in different directions in order to obtain the desired elevation. About 1,800 feet east of the place of the accident there is a mile post, No. 303, which was referred to in the Hubbard case as a whistle post. But there is no whistle post within two miles of this point. The road is through the mountains. There is neither station nor road crossing within that distance. The old Jerry's Run tower had been removed about three-fourths of a mile further west, but before its removal it was customary to sound the whistle about mile post 303 or a little east thereof, and after its removal this custom was frequently observed, although there was no necessity for it.

At the time of the accident the old Jerry's Run station was occupied by a Mrs. Fridley as a dwelling. Just east of Mrs. Fridley's house and old Jerry's Run tower,

the railroad passes through a cut, the bank of which is from sixteen to eighteen feet high on the south side—the fireman's side going west. The western portal of this cut is thirty feet east of Old Jerry's Run tower. Trains going west come around a right-hand curve along the base of the mountain until they reach the western portal of a cut nearly a quarter of a mile east of Mrs. Fridley's house, from thence the track is straight for 830 feet to a point in the cut just east of Mrs. Fridley's house. It then turns to the left and continues to the left on a three degree curve to and beyond the point of the accident. Mrs. Fridley's house is thirty-eight feet from the eastbound track, and has one window fronting the railroad and another looking west along the railroad track. There is a high bluff on the right or north side of the railroad just west of Mrs. Fridley's house. From a point on the railroad just opposite Mrs. Fridley's front window to the point of set-over, hereinafter mentioned, is 228 feet five inches, and from the latter point to the point of accident is 311 feet, thus making 539 feet five inches from Mrs. Fridley's window to the point of accident. From the point of the accident, looking east, to the curve in the cut just east of Mrs. Fridley's is 754 feet six inches.

Saville and Hubbard were traveling west on the westbound track. Train No. 1, which struck them, had been diverted and was traveling west on the eastbound track. Before reaching Mrs. Fridley's house, Saville and Hubbard had trouble with their motor and had gotten off their car and were pushing it along the westbound track when they passed Mrs. Fridley's house. After they had passed her house something over two hundred feet, Mrs. Fridley heard the whistle of No. 1 somewhere east of her house. When she heard the whistle blow, she saw Saville and Hubbard set the motor

car over from the westbound track to the eastbound track and proceed to push it along the up-grade on the eastbound track without ever at any time turning their heads to look back. She was still standing at her west window when the train passed on the eastbound track and continued to watch the train and Saville and his companion until the engine struck them, killing Hubbard and severely injuring Saville. The point of set-over is 228 feet five inches west of Mrs. Fridley's south window, and the point of the accident is 311 feet west of the point of set-over.

Leffel, who was examined as a witness for the plaintiff in the *Hubbard Case*, was not examined in this case, but, in lieu thereof the plaintiff introduced an engineer of five years experience and a map made by him of the scene of the accident, and a witness, A. G. Fauver. He proved by both of these witnesses various points along the approaching track from which a person, with an unobstructed view, could see a person standing on the track at the place of set-over. But this testimony was not deemed of sufficient importance to be even the subject of comment in the brief of the defendant in error. The map has not proved helpful to the court in ascertaining the facts of the case. It is on a different scale from other maps in the case, and every point of the compass has been reversed. The top of the map is south instead of north, and the right side is west instead of east. The Director General also introduced a cross-section map showing the slopes of the banks on each side of the track in the bluff just east of Mrs. Fridley's house. This map is not made a part of the record, but its correctness is not disputed. It is not claimed that the maps introduced by the Director General are inaccurate in directions, curves or measurements, but only that the map introduced by the plaintiff shows more

clearly the slopes of the cut east of the Fridley house and the width of the cut at the top and bottom. To use the language of the brief for the defendant in error: "The map offered in the case at bar by the plaintiff is a much more comprehensive map and one that sets forth the conditions at the point of accident, and near there, much more clearly than the map which was offered in the case of Hubbard's Administrator against the Director General of Railroads, and the map offered in the case at bar by the plaintiff shows the point of set-over; that is, the point where the plaintiff set the motor car from the westbound track to the eastbound track, and also shows that from the curve east of Mrs. Fridley's house, where the train first comes in sight of the point of set-over, that this curve is in favor of the engineer and gives him an opportunity to see from that curve the point of set-over, and beyond that point, and shows that there is nothing to obstruct the view of the engineer from said curve, westward to the point of set-over and beyond that point."

The map filed by the Director General and made a part of the record, not only shows each of these points but many others besides. This latter map was not in the *Hubbard Case*, but was used as illustrative on the reargument of that case. The new map introduced in this case by the defendant in error is only valuable as furnishing a basis for inference as to what the engineer or fireman might have seen from their positions on the engine, which inferences are contradicted by undisputed positive testimony.

The *Hubbard Case* had the most careful consideration of every member of the court. After full argument, both orally and on the briefs, differences of opinion developed among the judges, and reargument was had at the instance of the court on certain specified questions. The

case was then again carefully considered with the result shown in the official report. The case was assigned to Judge Saunders, who concurred with the majority, to write the opinion, but he died before the opinion was prepared. Then there was a petition for rehearing, which was denied. The brief for the defendant in error is taken up very largely with practically a reargument of the *Hubbard Case.* We are of opinion that the defendant in error has not strengthened his case so far as relates to negligence on the part of the engineer, and in this respect we adhere to the position taken in the *Hubbard Case.*

The engineer's seat overhangs the right rail of the track, and if a straight edge be placed along the base of the straight track, either between the tracks or on the right rail of the eastbound track and extended to the bluff beyond Mrs. Fridley's house, it will be found that it strikes the bluff considerably to the right of the westbound track; but the defendant in error has insisted that the engineer had a cross vision which would extend to the point of set-over. This is mere theory. He relies in part upon the testimony of Robinson, fuel supervisor of the railroad, introduced by the plaintiff in error, to support his theory that the cross vision of the engineer would enable him to see the point of set-over while he was traversing the straight track. He did testify to the fact, which is a matter of common knowledge, that looking ahead on a straight track there would be a cross-over vision. But notwithstanding this fact he testified that he had made a trial trip on an engine of exactly the same type as the engine in controversy but that at no point along the straight track could the point of set-over be seen by the engineer. His testimony on this subject is as follows:

"Q. Now whereabouts, before you reach that straight

line, if at all, from the engineer's side looking through the window, can you see Old Jerry's Run cabin?

"A. After you get up on the straight line you can see the cabin.

"Q. Can you see it before you get on the straight line?

"A. No, sir.

"Q. Just as you turn into the straight line state in which direction the engine is pointing. Is it pointing towards Jerry's Run cabin or towards the south wall of the cut?

"A. It was sorter in a position towards the cabin after you came around the curve.

"Q. Then it turns towards the cabin?

"A. Yes, sir.

"Q. From the engineer's side can you see the south wall of that cut that is just east of Jerry's Run cabin at the place where you turn into the straight line, or does the engine itself obstruct your view?

"A. You can see the point of the bluff.

"Q. The west point or the east point?

"A. The east point.

"Q. You are mistaken in the bluff. I don't mean the bluff beyond the cabin, but I mean the bluff to the east of the cabin. Can you see the rock wall of that cut?

"A. You can see that when you first come on the straight line.

"Q. How far up the track, when you are on the east-bound track going west, on engine 160 or 166, beyond Old Jerry's Run cabin, can you see from any point on that straight line?

"A. How far west?

"Q. Of Old Jerry's Run cabin can you see from any point on that straight line? You said you can see the east point of the bluff. Can you see the track at all?

"A. No, sir.

"Q. You cannot even see the westbound or north track from the engine on that side?

"A. Not beyond the bluff.

"Q. Now, as you came on down through that cut, into the cut rather, that is just east of Jerry's Run cabin, state how far you can see beyond Old Jerry's Run cabin, or can you see beyond it at all. Your engine being in the same position I have just spoken of?

"A. You mean how far on the eastbound track?

"Q. Yes, sir; can you see?

"A. You cannot see on the track at all. You can see, I reckon, about half way between the point of the bluff, after you get up on the curve.

"Q. You can see half way, but on the westbound track?

"A. Yes, sir.

"Q. And not on the eastbound track at all?

"A. No, sir.

"Q. Mr. Robinson, did you make a very careful test of this?

"A. Yes, sir. You all told me what you were up there for, and I was looking carefully to see."

This witness also testified as to what could be seen out of the side window. It is not said in so many words, but it is manifest from his testimony that he meant that a certain view could be had by leaning out of the side window, but it must be borne in mind that the side window was closed. It was "a cold morning, cloudy and blowing snow," and very dark, and the engineer was under no obligation to have the side window open. It was an interstate railroad and the government regulation provided that there should be a front window ten by fourteen inches, and it was out of this window that the engineer was looking. As the train was going west,

of course the side window to the right of the engineer was looking north, and if the engineer simply looked through the glass he would not have been looking in the direction in which the train was going, and was not in fault in not having the window open. The piece of straight track was 830 feet long and would have been traversed by the engine in from thirty-two to thirty-eight seconds. The engine approached this piece of track on a five degree curve to the right. The engineer was on the concave side of this curve. The point of set-over was on a three degree curve to the left, which could not have been seen from the engineer's position as he approached the straight track. When he entered upon the straight track he had a clear view for 830 feet and could have stopped his train within about half that distance, but there was no trouble on the straight track. It is claimed, however, that the engineer could and should have looked through the cut some 300 feet and he would have seen the point of set-over. The whole distance of the straight track, as we have seen, would have been traversed in from thirty-two to thirty-eight seconds and the cross-over vision would have been constantly diminishing as the point of set-over was approached. It would seem hardly probable, even from the point of view of the defendant in error, that this cross-over vision would have extended more than half the distance of the straight track, which would have been traversed in from sixteen to nineteen seconds. And even this is based upon the theory evolved from the map of the defendant in error that the point of set-over would have been within the cross vision of the engineer, although the positive testimony on the subject is that the point of set-over could not be seen from the position of the engineer in his cab. It must be borne in mind that the duty which the engineer owed to Saville was ordinary care, and we are not permitted to

theorize on the possibility that the engineer might, within a small fraction of a minute, have looked further ahead through a cut and have seen part of the cut to either side. Viewing the case in the most favorable light for the defendant in error, we are of opinion that the testimony fails to show negligence on the part of the engineer. As said in the *Hubbard Case*, "photographs and drawings do not always give us as accurate ideas of what may be seen from the *locus in quo* as the testimony of unimpeached witnesses who have been on the ground and have observed the situation and testified as to what can or what cannot be seen from a given point.

We are unwilling to infer that the engineer could have seen the point of set-over from the straight track when the drawings do not demonstrate it, in the face of the positive testimony of the engineer who testifies that he could not see it, and of another observer from a similar engine on the same piece of track that it could not be seen.

As to negligence on the part of the fireman, the case is not as favorable to the defendant in error as the *Hubbard Case*. Mrs. Fridley's house fronted about fourteen feet on the railroad, the eastbound track of which was distant about thirty-eight feet. There was a window on the south side, facing the railroad, about seven feet from the west corner of the house, and one on the west side about five feet from the corner. The gangway of the engine— the space between the cab and the tender—was twenty-four inches wide. The train was running from fifteen to eighteen miles an hour, and the sides of the tender were the same height as the roof of the cab. Mrs. Fridley was standing at the west window, "right flush up" with the window, and testifies that from that position she watched the train as it passed; that she could see

through the gangway from one side to the other; that the engineer was not on his seat nor anywhere in sight; that the fireman was not on his seat, nor on the deck or floor of the cab, nor in the gangway, nor anywhere in sight; that after the engine passed the corner of her house she could see over the tender into the cab, although there was a curtain hanging from the roof of the cab at the rear. She also testified that if the fire-box had been open she could have seen the glow from the fire, but saw none. While we do not impute to Mrs. Fridley any intentional wrong, it is physically impossible for her to have seen through the gangway from the angle at which she was looking, or to have seen into the rear of the cab over the top of the tender. The engineer and firemen were both on the engine and could only have been in one or the other of the places mentioned by her. There was nowhere else they could have been. She also testified that she saw the engine strike Saville and Hubbard. She was on the convex side of a three degree curve and the engine was pulling eight coaches, and if the photograph introduced in evidence is at all to be relied on, it was impossible for her to have seen the impact. The intervening coaches would have obstructed her view. She, however, fixes the points about which there is no dispute. The point of set-over, which was 228 feet five inches west of the south window of her house, and the point of the accident, which was 311 feet west of the point of set-over and 539 feet five inches west of her house; thus showing that after the whistle was sounded, Saville and Hubbard transferred their car and pushed it up-grade a distance of 311 feet. There is conflict as to where the whistle was sounded. Counsel for Saville insist that Mrs. Fridley's testimony was that it was sounded at the east portal of the cut nearest her house. This was about 743 feet

from the point of set-over.  The motor car was about all two men could handle, estimated to weigh about 400 pounds, and it would have required a half minute as a minimum to make the set-over.  In the meantime the train was running at from fifteen to eighteen miles an hour, and would have traversed the distance in from thirty to thirty-four seconds.  This would have made the point of impact at or about the point of set-over, whereas it was in fact 311 feet west of the point of set-over.  It is manifest, therefore, that the whistle was not sounded at the east portal of the cut just east of Mrs. Fridley's house.  In fact Mrs. Fridley did not know where the whistle was sounded.  The engineer states that he does not recall whether he sounded the whistle that morning or not, but that when sounded the custom was to sound it about 303 mile post, "or a little east" of it.  Other facts in the case indicate that the whistle must have been sounded somewhere near the point indicated by the engineer.  In the *Hubbard Case,* the testimony left it uncertain just where the fireman began firing his engine, but in this case the evidence is more satisfactory.  There was a tunnel seven-eighths of a mile long about three-fourths of a mile west of Mrs. Fridley's house, and, in order to avoid the gas and smoke which would result from firing in the tunnel, heavy firing was done some time before reaching it, and in the instant case the firing had been going on for such length of time that when Mrs. Fridley's house was reached, the fireman had his engine just as hot as he could get it.  He must have been firing along the straight track before reaching Mrs. Fridley's house.  On this subject the engineer testified as follows:

"Q. Now you don't remember, as a matter of independent recollection, whether the fireman was firing or where the fireman first commenced firing as you went up the mountain, do you?

"A. It must have been after we passed this mile post, when he was down there, because they usually get down in there somewhere.

"Q. I asked you if you remembered that of your own independent recollection or is that what you understand was the custom?

"A. I remember this man was down that particular morning firing.

"Q. Where else did he get down and fire going up that mountain except that place?

"A. You understand, it is like this, in firing an engine or a locomotive, you will fire it to the best advantage you can. You cannot shovel coal into that like you put in a stove or anything like that. A man when he puts a shovel full of coal into the fire-box, he has got to spread it and the best result we get is when a man puts the coal in and scatters it as he puts it in. He cannot go to work and put in twenty-five or thirty shovels full of coal, he has got to put in four or five or six or maybe ten and then he has got to stand there and wait a little bit until that fire brightens up and then he puts in others, and if he gets too much in then he has got to get a hook and break it up.

"Q. I want to ask you this question. You have stated that this fireman, Mr. Meadows, got down to the fire soon after he passed that mile post. Is that what you said?

"A. Yes, sir; that is what I say, and he must have been firing along that straight line that you spoke of.

"Q. He must have been?

"A. Yes, sir.

"Q. You don't remember that, do you?

"A. I remember that he was, and I remember that he was down in the deck until after this accident occurred. *  *  *

"Q. Firing all the time?

"A. Not incessantly.

"Q. Putting coal in the fire-box all the time?

"A. No man does that.  They don't fire that way; they can't fire that way.

"Q. How long between times?

"A. Some of them will stand in the deck three or five, and some will stand two minutes and others might step up on his box every time he puts in the fire, they have different methods.

"Q. You don't know how long he stood down there, do you?

"A. I couldn't say positively how long he stood down there.

"Q. You don't know whether he stood down there five minutes or two or three minutes or whether he got on his seat-box, do you?

"A. That would be hard for me to remember, how he did that, after this length of time, I wouldn't like to say.

"Q. And you wouldn't like to say that he got down at the mile post to fire?

"A. Not exactly at the mile post.

"Q. And you wouldn't like to say that he fired all the way up that straight track, would you?

"A. No, sir; because I know he did not.  He fired at intervals, of course."

The fireman could not fix definitely where he began firing, but after testifying, as in the *Hubbard Case*, that while on the straight track his view of the point of set-over was obstructed by the bluff on the south side of the cut just east of Mrs. Fridley's, he further testified: "I commenced putting in fire considerably east of Old Jerry's Run."  It is unnecessary to repeat what was said in the *Hubbard Case*, to which we adhere, but if it were conceded that it was possible for the fireman, at

some point on the straight track to have seen beyond
the bluff, it now appears that he was in discharge of his
duty of firing the engine practically along the whole of
the straight track.    Certainly there is nothing in the
record to show that he was negligent in this respect.    At
the rate of speed at which the train was traveling, the
straight track would have been traversed in from thirty-
two to thirty-eight seconds, and the fireman was cer-
tainly firing during a part, if not all, of that time, and it
would be mere guesswork to say that there was any time
left in which the fireman should have seen the point of
set-over, even if his view had been unobstructed.    The
plaintiff had the burden of proof to establish the negli-
gence of the defendant, but it cannot be established by
such evidence as this.

For the reasons stated, the judgment of the trial
court will be reversed and final judgment entered for the
plaintiff in error.

*Reversed.*

SIMS, J., dissenting:

I think that the maps in evidence and the admissions
of the witness Robinson on cross-examination, showing
the range of the cross vision which the engineman and
also the fireman had ahead of them, make a stronger
case for the plaintiff in the instant case than was made
for the plaintiff in the *Hubbard Case* (referred to in the
majority opinion), with respect to the inferences prop-
erly to be drawn in favor of the plaintiff, in view of the
fact that the case is before us upon the demurrer of the
defendant to the evidence.    I think, therefore, that, to
say the least, the same inferences should be drawn in the
instant case as are mentioned in the dissenting opinion
in the *Hubbard Case*, and that the testimony for the de-

fendant in conflict therewith should be disregarded. Hence, for substantially the same reasons as are given in the dissenting opinion above mentioned, I feel constrained to dissent from the majority opinion in the instant case.